UNITED STATES of America, Department of Treasury/Internal Revenue Service, Appellant,

v.

TM BUILDING PRODUCTS, LTD., Appellee.

No. 95–2580–CIV–GOLD.
Bankruptcy No. 95–10481–BKC–AJC.

United States District Court,
S.D. Florida,
Miami Division.

Oct. 5, 1998.

---

David C. Profilet, Profilet & Associates, Miami, Florida.

Paul J. Battista, Kelley Drye & Warren, Miami, Florida.

Mark Stier, U.S. Department of Justice, Washington, D.C.

## ORDER AFFIRMING BANKRUPTCY COURT'S ORDER CONFIRMING CHAPTER 11 REORGANIZATION PLAN

GOLD, District Judge.

THIS CAUSE comes before the Court upon an appeal from the Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization, as Modified, entered September 14, 1995 by Chief United States Bankruptcy Judge for the Southern District of Florida, A. Jay Cristol. The Appellant identifies defects in the Reorganization Plan (the "Plan") which, it asserts, make the Plan unconfirmable. The issues raised by Appellant as grounds for this appeal are that: (1) the Bankruptcy Court should not have confirmed the Plan because it did not comply with 11 U.S.C. § 1129(a)(9)(C); and (2) the Bankruptcy Court erred in confirming an unfeasible Reorganization Plan.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 158(a). This Court has carefully reviewed the record in this appeal, the parties' briefs, the transcript of the confirmation hearing, the Order entered by the Bankruptcy Court, and the relevant law. An evaluation of the Bankruptcy Judge's application of the factors for determining feasibility and fairness of the Plan reveals no error on the part of the Bankruptcy Court. Therefore, this Court finds the Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization, as Modified should be affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee, TM Building Products, Ltd. ("Appellee"), is a Florida corporation, formerly owned and controlled by Thomas J. Metzger ("Metzger"). Experiencing financial difficulties, Appellee petitioned the U.S. Bankruptcy Court for the Southern District

of Florida, seeking relief under Chapter 11 of the Bankruptcy Code (the "Code"). Appellee filed its petition on February 2, 1995. Under Chapter 11, a bankrupt debtor can reorganize its debts to enable payment over a period of time.

On March 16, 1995, Appellant, the Internal Revenue Service filed a proof of claim on behalf of the United States of America ("Appellant"). The Proof of Claim listed claims totaling $1,481.575.05, consisting of $20,855.23 in unsecured general claims, $1,312,830.01 in secured claims, and $147,449.81 in unsecured priority claims.

Thereafter, Appellee filed an Amended Chapter 11 Plan of Reorganization on May 25, 1995 (the "Plan"). Section 3.3 of the Plan listed Appellant's claims, as well as those of the Florida Department of Labor and Employment Security and the Florida Department of Revenue, all of which accumulated from unpaid social security and unemployment taxes. These claims were classified as "secured," and consisted of liens for unpaid taxes, prioritized according to the recording dates of the creditors' respective liens. Appellant's secured claims consumed six of the seventeen classes, based on pre-petition tax liens in which Appellant claimed a secured lien on all of Appellee's assets.

Subsequently, on June 6, 1995, Appellant amended its proof of claim. As modified, Appellant listed $297,187.64 as general unsecured claims, $419,977.19 as secured claims, and $703,306.91 as unsecured priority claims, totaling $1,420,471.74.

Appellant then filed objections to the Plan, challenging the allocation of the trust fund payments, the provisions for the payment of administrative expenses, the feasibility of the Plan, and the provisions requiring quarterly payments for satisfying the secured and priority claims.[1] Appellant did not object to the Plan's claim classification.[2]

As a result, Appellee modified the Plan prior to the confirmation hearing. The modified Plan provided that, after confirmation, Appellee could continue business operations as a reorganized debtor. As reorganized, the Appellee was responsible for completing its contractual obligations and for collecting the net proceeds derived from these construction contracts. Additionally, the reorganized debtor was to collect payments due under a note from TM Window and Door Company ("TM Window"), Appellee's successor entity.[3] The note covered the purchase price of Appellee's inventory and equipment, which it sold to TM Window pursuant to the Plan. The trustee of a trust created under the Plan was responsible for collecting Appellee's outstanding accounts receivable. Proceeds collected from these three sources were to be deposited into a segregated account for distribution to the creditors in accordance with their listed priority. As such, the Plan constituted a liquidating Plan, as well as a "spillover" Plan, whereby the claim holders in a particular class were to receive payments only after claims of higher priority were paid in full, with interest.

The Bankruptcy Court conducted a confirmation hearing on August 30, 1995. At the hearing, Appellee and Appellant were given

1. Appellant filed its first objections to the Plan on June 26, 1995. At that time, Appellant did not object to the Plan's feasibility; instead, it objected to the interest rates applied to priority and secured claims. The Amended Objections filed by Appellants on August 18, 1995, did not include objections to the interest rates, but added a general objection as to feasibility.

2. Although there is no express objection to Appellant's classification, the Court finds that Appellant assumed that some of its claims were inherently classified as "priority." The problem seems to stem from Appellant's Ballot forms, one of which rejected the secured claims in classes 3, 5, 6, 8, 9, and 13, and another Ballot form which rejected "unsecured priority" claims in the amount of $703,306.91 in "Class I." There is no

such class, and there is no indication how this amount was calculated, since all of Appellant's claims were listed in the six classes noted in the Ballot rejecting the secured claims.

3. The Bankruptcy Court explained that the debtor entity, Appellee, was going to be liquidated, while the owner of the debtor entity, Metzger, would reorganize as TM Window. The plan was for TM Window to purchase all the assets of Appellee, and assume Appellee's contractual obligations which had accrued prior to declaring bankruptcy. The proceeds from the sale of assets and the funds realized on the completed contracts were for distribution to the creditors listed in the Plan in their respective priority classifications.

the opportunity to present witnesses regarding the feasibility of the Plan. Appellant opposed the Plan, urging denial of confirmation. Appellant argued that, based on Metzger's propensity for delinquent tax payments, the Plan was not feasible. Additionally, Appellant objected that payments on claims were limited to such times as "reasonably practicable." Appellant's principal objection was that the Plan "forces the government to wait longer than it should have to, given all of the facts and circumstances of this debtor, to collect taxes." No other secured creditor objected to the Plan, even though the combined total of claims owed to the State of Florida taxing authorities approached $400,-000, most of which held lesser priority.[4] Significantly, Appellant never objected to the Plan's classification of its claims as secured rather than priority, although it continued to refer to its "priority" claims, without designating which class of the Plan was implicated.

The Bankruptcy Court, seeking to ensure the viability of the successor entity, allowed Appellee to pay Appellant's secured claims at such times "when funds are available without adversely impacting the case flow needs of the company [TM Windows]." The Bankruptcy Court, persuaded by testimony presented by Appellee and a statement made by counsel for the Florida Department of Labor, focused on two issues: (1) that creditors would receive more under the Plan than by liquidation; and (2) that employees of the successor company would remain employed. After considering the testimony of the witnesses and the arguments of the parties, the court concluded that confirmation of the Plan was in the best interests of the secured creditors, who would receive at least as much, if not more, under the Plan than through liquidation. Additionally, the court was satisfied that Appellee's employees would avoid unemployment.

The Bankruptcy Court instructed counsel for Appellee to draft an Order of Confirmation with the input of all creditors. Mindful of Appellant's apprehension that the Plan gave Appellee too much discretion in paying Appellant's claims, the Bankruptcy Court retained jurisdiction over the matter. If, after implementation of the Plan, problems arose or it appeared that Appellee was unreasonably avoiding its obligations, the Bankruptcy Court would review the situation and, if necessary, would modify the Plan or order liquidation.

The Bankruptcy Court signed the Order of confirmation on September 14, 1995. Without regard to the Bankruptcy Judge's admonition to allow the Plan to succeed and to bring any nonconforming conduct to his attention, Appellant filed its Notice of Appeal, listing five issues for appeal. However, Appellant's brief argues only that the payment schedule under the Plan violates 11 U.S.C. § 1129(a)(9)(C) because it sets no limitations on satisfying Appellant's priority claims and is discriminatory as to Appellant's secured claims.[5] Appellee identifies the issue solely as a matter of claim classification, arguing that since Appellant did not object to its classification in the Plan as "secured," Appellant is precluded from having the tax claim treated as an unsecured priority claim pursuant to 11 U.S.C. §§ 507(a)(8) and 1129(a)(9)(C).

## II. Standard of Review

 Conclusions of law issued by bankruptcy courts are reviewed *de novo*. *See In*

---

4. The Florida Department of Labor argued in favor of the Plan, even though expecting to receive only half of the amount owed on its liens. The Department felt the Plan was better than liquidation, because "if the plan is not confirmed ... [the Department] will be faced with paying unemployment compensation claims and no entity to pay the taxes in the future." Thus, Florida "respectfully request[ed] the Court to consider confirming the plan."

5. The five issues listed in Appellant's Notice of Appeal are: (1) that the Bankruptcy Court erred in ruling feasibility of not an issue in confirmation of the Plan; (2) that there was no "concrete" evidence of cash flow sufficient to fund continued business operations and obligations under the Plan; (3) that Appellant's objections warranted denial of confirmation; (4) that making payments under the Plan "at such times and from time to time as funds are available ... without causing a materially adverse effect on the Reorganized Debtor's cash flow needs" was reversible error; and (5) that the Plan should not have been confirmed.

*re Sublett,* 895 F.2d 1381, 1383 (11th Cir. 1990). *De novo* review requires the Court to make a judgment "independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1210 (7th Cir.1984). Where an issue raises a mixed question of law and fact, District Courts are instructed to review a bankruptcy court's determination *de novo. See In re Marks,* 131 B.R. 220, 222 (S.D.Fla.1991), *aff'd,* 976 F.2d 743 (11th Cir.1992).

District Courts must give considerable deference to a bankruptcy court's findings of fact, and will not overturn a bankruptcy court's factual findings unless it determines that those findings are clearly erroneous. *See In re Chase & Sanborn Corp.,* 904 F.2d 588, 593 (11th Cir.1990); *In re Pepenella,* 103 B.R. 299, 300 (M.D.Fla. 1988).[6] A finding of fact is clearly erroneous when the record lacks substantial evidence to support it such that an appellate court's review of the evidence results in a firm conviction that a mistake has been made. *See Blohm v. Commissioner of Internal Revenue,* 994 F.2d 1542, 1548 (11th Cir.1993).

## III. Discussion and Analysis

As a threshold matter, courts must not lose sight of the overriding policy of the Bankruptcy Code (the "Code"), which is to release the debtor from the burden of his indebtedness and provide him with a new opportunity in life, free from the pressures of pre-existing debt. *See Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971). The purpose of Chapter 11 is to successfully rehabilitate the debtor. *See National Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1196 (1984).

In enacting the Code, Congress set out a detailed process by which creditors of a bankrupt entity are to be repaid in an orderly fashion. *See In re A & B Heating & Air Conditioning,* 823 F.2d 462, 465 (11th Cir. 1987). Through this process, "Congress has

provided bankrupts with extensive protection from their creditors and a reasonable opportunity to rehabilitate not only for their benefit but for that of the public as well." *Id.* (citation omitted).

Reorganization, not liquidation, is preferred, since "a viable reorganization plan typically provides a greater payment to creditors while preserving the economic life of he entity." *Id.* To ensure the policy behind the Code is implemented equitably, Congress left questions of debt allocation in Chapter 11 cases to the discretion of bankruptcy judges, to resolve these issues on a case-by-case basis. *See id.* In determining whether a debtor should be permitted to allocate taxes in Chapter 11 reorganization, the bankruptcy court is directed to consider equitable reasons justifying such allocations, such as:

> the history of the debtor, the absence or existence of prebankruptcy collection or "enforced collection measures" of the IRS against the corporation and responsible corporate officers; the nature and contents of a Chapter 11 plan (e.g., last resort liquidation or reorganization); the presence, extent and nature of administrative and/or court action; the presence of pre- or post-bankruptcy agreements between the debtor (or trustee) and the IRS; and the existence of exceptional or special circumstances or equitable reasons warranting such allocation.

*Id.* at 466.

### A. The Plan Correctly Classified Appellant's Debts as Secured

Appellant first contends that the Bankruptcy Court's confirmation of the Plan contravened provisions enumerated in 11 U.S.C. § 1129(a)(9)(C), by disregarding Appellant's priority status, granted to governmental taxing units. Appellant argues that the Plan, which includes pre-petition tax liabilities of Appellee, lists Appellant's claims as "secured," rather than as "unsecured priority" claims.

---

**6.** Under Bankruptcy Rule 8013, the District Courts are instructed that "findings of fact shall not be set aside unless clearly erroneous, and due

regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed.R.Bankr.P. 8013.

The priority claims noted in § 1129(a)(9)(C) require a total payoff of the debt within a six-year period commencing from the date of assessment. However, the Plan only requires Appellant's claims to be paid at such times "when funds are available without adversely impacting the cash flow needs of the company." Appellant argues that since the Plan does not provide for payment of Appellant's tax claims, which it asserts are unsecured priority claims, within a six-year period, the Plan should not have been confirmed. This Court disagrees with Appellant's designation of its claims as "unsecured priority" claims.

The Plan at issue was for reorganization, pursuant to 11 U.S.C. § 1129, which authorizes confirmation provided the requirements set forth in § 1129(a) are met. Each subsection therein establishes a different standard for evaluating the contents of a plan of reorganization. Some standards deal generally with what is required of a plan of reorganization. Section 1129(a)(3) mandates that the plan be proposed in good faith. Other subsections contain specific requirements for the treatment of distinct classes of claims. Section 1129(a)(9) outlines the treatment necessary for priority claims in a Chapter 11 plan of reorganization.

Appellant asserts that its secured claims should be entitled to treatment as priority unsecured claims, for which Appellee must satisfy the debt in full, with interest, within six years from the date of its latest assessment of its claims. Appellant contends that since the latest assessment date for its priority tax claims was March 27, 1995, Appellee must pay these claims in full no later than March 28, 2001. Therefore, any other provision extending the date for full satisfaction of Appellant's claims beyond March 28, 2001 is violative of § 1129(a)(9)(C). The record does not support Appellant's argument.

▮▮▮▮ To determine whether Appellant is entitled to unsecured priority, the claim must conform to the provisions of § 1129(a)(9)(C). Section 1129(a)(9)(C) requires a Chapter 11 plan to provide for the payment of the priority taxes specified in § 507(a)(8) of the Code. This subsection, by making reference to § 507(a)(8), specifically concerns the treatment to be afforded the unsecured claims of governmental units. The priority classes listed in § 507 are "intended to be the exclusive list of priorities in bankruptcy." *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 796 (4th Cir.1998). Since only Congress may fix priorities, "[c]ourts are not free to fashion their own rules" conferring priority classification. *Id.*

Section 507(a)(8) provides, in pertinent part, that:

(a) The following expenses and claims have priority in the following order:

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts—

(i) for a taxable year ending on or before the date of filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;

(ii) assessed within 240 days, plus any time plus 30 days during which an offer of compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition. . . .

11 U.S.C. § 507(a)(8) (1997). The plain language of § 507(a)(8) states that its application only pertains to *unsecured* claims, to protect these creditors "in the likely event that there will be insufficient funds in the estate to distribute if all taxes were to be paid in full as a priority." *In re Olson*, 154 B.R. 276, 281 (Bankr.D.N.D.1993).[7] However, the presence or absence of a recorded Notice of Federal tax Lien at the time a

---

**7.** The Bankruptcy Reform Act of 1994, Pub. L. No. 103–394, redesignated § 507(a)(7) as § 507(a)(8). The language and intent of the redesignated section is the same as before the numeric change. Many of the cases cited herein, adhered to the designation applicable at the start of the proceedings at issue therein. However, since the meaning and interpretation remains the same, those cases are still applicable, but this Court will cite to the designation applicable at the start of these proceedings, namely, *§ 507(a)(8)*.

petition for Chapter 11 relief is filed will control how a claim, such as Appellant's, is treated in bankruptcy. *See United States v. Creamer,* 195 B.R. 154, 156 (M.D.Fla.1996); *In re Reichert,* 138 B.R. 522, 526–27 (Bankr. W.D.Mich.1992). If a Notice of Federal Tax Lien is recorded *before* the petition in bankruptcy is filed, the creditor is classified as "secured" and the priority rules of § 507(a)(8) do not apply to that secured claim. *See id.* If, on the other hand, a Notice of Federal Tax Lien is not recorded before the petition, the claims are unsecured claims, governed by § 507(a)(8) and may be given priority status. *See In re Olson,* 154 B.R. at 280.

In this case, Appellant's tax liens listed in the Plan arose on the date of assessment, and were recorded prior to Appellee's filing of its petition in bankruptcy. Thus, these claims are not "unsecured claims of governmental units," and § 507(a)(8) does not apply. Having recorded the tax liens pre-petition, Appellant holds secured claims, which are not entitled to priority under § 507(a)(8). Therefore, § 1129(a)(9)(C) does not apply to those claims. *See In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1504 n. 1 (9th Cir.1987).

The Court does not accept Appellant's inference that the date of Appellant's "latest assessment" should govern the classification of the tax claims covered under pre-petition recorded tax liens. There is nothing in the legislative history of §§ 507(a)(8) and 1129(a)(9)(C), nor has the Court found any cases to support Appellant's contention of entitlement to priority status on the circumstances underlying their claims. Therefore, based on the record, Appellant's claims listed in Section 3.3 of the Debtor's Amended Reorganization Plan are secured claims, and do not warrant treatment as unsecured priority claims pursuant to § 1129(a)(9)(C).[8]

### B. The Plan Satisfies the "Cram Down" Provision of 11 U.S.C. § 1129(b)

Appellant contends that the Plan, which "crams down" the secured portion of its claims, unfairly discriminates against Appellant and is inequitable. Because the Plan does not provide a schedule specifying the amounts and dates of payments to secured creditors, Appellants assert the Plan violates § 1129(b)(2)(A)(i)(II). Determinations by the Bankruptcy Court of this sort are reviewed under the clearly erroneous standard. *See In re Saylors,* 869 F.2d 1434, 1438 (11th Cir.1989).

Appellee sought to confirm the Plan over the objections of Appellant. The Code provides that if one or more impaired classes do not consent to the plan, confirmation must meet the "cram down" requirements of § 1129(b), which permits a plan complying with all other requirements under § 1129(a) to be confirmed despite the failure of an impaired class to accept it. *See In re Bryson Properties,* 961 F.2d 496, 500 (4th Cir.1992). Additionally, the cram down provision of § 1129(b)(1) requires that a plan be "fair and equitable" with respect to an objecting impaired class. *See* 11 U.S.C. § 1129(b)(1) and § 1129(b)(2)(A).

A court may confirm a plan that provides for deferred payment of secured claims under § 1129(b)(2)(A)(i)(II) upon the assurance that "each holder of a secured claim receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property." 11 U.S.C. § 1129(b)(2)(A)(i)(II); *see also United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 377, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (under § 1129(b), a secured claimant has the right to receive the present value of his cash collater-

---

**8.** The Plan makes reference to tax claims entitled to priority status. Section 1.39 of the Plan defines a "priority tax claim" as "a Claim to the extent it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code." Furthermore, section 2.2 of the Plan tracks the language of § 1129(a)(9)(C), stating that the holder of a priority tax claim shall receive the full amount of the claim "over a period not exceeding six (6) years after the date of assessment of its Claim equal to the principal amount ... plus interest thereon ... in equal quarterly installments...." Thus, Appellee allotted for Appellant's priority tax claims, which would be those claims remaining unrecorded after the date Appellee filed its petition in bankruptcy.

al). "Deferred cash payment" has been defined to mean "periodic payments, the interval of which is determined by balancing the circumstances of the debtor with the reasonable right of the creditor to receive prompt payment of its claim." *In re Arrow Air, Inc.,* 101 B.R. 332, 335 (S.D.Fla.1989) (citing *In re Mason & Dixon Lines, Inc.,* 71 B.R. 300, 303 (Bankr.M.D.N.C.1987)).

A review of the transcript of the confirmation hearing reveals that the Bankruptcy Court carefully considered the differing positions of the parties. Appellee presented convincing testimony that maintaining business operations in the reorganized debtor was preferable to liquidation because the Plan "provides a better alternative to those creditors who will be paid, than a conversion to Chapter 7 and liquidation."[9] Appellee included evidence that the administrative costs of liquidation would be higher than under the Plan, leaving less money to pay down the claims.

The Florida taxing authorities voted in support of the Plan, even though they expected to receive less than the amount of their liens. The taxing authorities had dealt with Metzger and his entities for several years, and had reached an understanding with him that agreed upon payments would be paid on time. Based on their involvement with Metzger, these authorities believed it was economically feasible to permit the reorganized debtor to maintain operations, rather than having to pay unemployment compensation claims while having no entity to pay taxes in the future.

Contrary to Appellant's contention, it was not the court's intent to leave payments to Appellee's "unfettered discretion." The Bankruptcy Court retained jurisdiction to review distributions under the Plan "to determine that they are made when money is available ... and to review current payments of current tax obligations." By allowing the reorganized debtor to continue as a going concern, it was determined that the debt could be paid off in three to four years.

Rejecting Appellant's argument that it should not have to wait to be paid, the Bankruptcy Court noted that liquidation is not an immediate remedy, since it would take years to consummate. Moreover, the court pointed out that Appellant is forced to wait because the Code provides that:

> [w]hen it appears in the best interest of creditors and the best interest of an economic situation, such as [a] hundred plus employees who will continue to work at their jobs, it makes sense in some instances to delay ... while it may take a year longer ... it would take about the same amount of time to get the liquidation value.

Appellants argued that a previous bankruptcy filing by Metzger, concerning a predecessor corporation, established his inability to perform under the Plan, and therefore, the Plan is not feasible. However, based on its prior involvement with Metzger, the Bankruptcy Court was impressed with the good faith shown by his past performance before the court. The delayed tax payments made during the pendency of the Chapter 11 proceeding were too nominal to be considered as determinative factors.

Although Appellants have claimed that the Plan unfairly discriminates and is inequitable with respect to secured creditors, Appellant has not demonstrated discrimination as a consequence of confirmation. Based on the record before this Court, the Bankruptcy Court was justified in finding the Plan did not discriminate unfairly against Appellant, in violation of § 1129(b)(2)(A)(i)(II).

## IV. Conclusion

 In determining the feasibility of a reorganization plan pursuant to Chapter 11 of the Code, the Court is required to determine whether the Plan offers a reasonable prospect of success. *See In re Johns–Manville Corp.,* 68 B.R. 618, 635 (1986), *aff'd in part, rev'd in part* 78 B.R. 407, *aff'd sub nom, Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2nd Cir.1988). A debtor need not

---

**9.** Specifically, the Bankruptcy Judge stated:
[I]t appears that it's in the best interest of the creditors, at least those creditors who will participate in distributions, to have the plan con-

firmed. It seems like there is a potential upside and a down side, but even with the down side the creditors are probably better off, and at least no worse off.

prove with absolute certainty that he will be able to complete the payments under the plan. *See id.; see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992). "The test is whether the things which are to be done after confirmation can be done as a practical matter." *In re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978). The mere prospect of financial uncertainty is not a sufficient ground to defeat confirmation. *See Drexel Burnham*, 138 B.R. at 762.

This Court finds that Appellee established a reasonable chance for success of the Plan. Based upon the facts adduced from the transcript of the confirmation hearing, the Plan appears to have been proposed in good faith, is feasible, and is fair and equitable regarding secured creditors, such as Appellant. Thus, the findings of the Bankruptcy Court were not clearly erroneous, and confirmation of the Plan was appropriate. Accordingly, it is

**ORDERED AND ADJUDGED** that the Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization, as Modified, entered by the Bankruptcy Court for the Southern District of Florida on September 14, 1995, is hereby AFFIRMED.